UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MIRIAN JIMENEZ,

                Plaintiff,

        - against -

CAROLYN W. COLVIN,[1] Acting Commissioner
of Social Security,

                Defendant.
-----------------------------------------------------------X

**MEMORANDUM AND ORDER**
11 CV 4599 (DRH)

**APPEARANCES:**

**SULLIVAN & KEHOE**
Attorneys for Plaintiff
44 Main Street
Kings Park, New York 11754
By:    Michael Brangan, Esq.

**LORETTA E. LYNCH**
**UNITED STATES ATTORNEY**
Attorney for Defendant
610 Federal Plaza
Central Islip, New York 11722
By:    Vincent Lipari, Assistant U.S. Attorney

**HURLEY, Senior District Judge:**

       Plaintiff Mirian Jimenez ("plaintiff") commenced this action pursuant to 42 U.S.C. §

405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "defendant") that denied her claim for disability benefits.  Presently before

the Court are defendant's motion and plaintiff's cross-motion for judgment on the pleadings.  For

---

     [1]      The Complaint, which was filed on September 21, 2011, named Michael J.
Astrue, the former Commissioner of Social Security, as the defendant.  On February 14, 2013,
Carolyn W. Colvin was named the Acting Commissioner of Social Security.  She has therefore
been substituted as the defendant in this matter pursuant to Federal Rule of Civil Procedure
25(d).

the reasons discussed below, defendant's motion is granted, plaintiff's cross-motion is denied, and the decision of the Commissioner is affirmed.

## BACKGROUND

### I.    Procedural Background

Plaintiff applied for disability insurance and Supplemental Security Income ("SSI") benefits on July 2, 2009, alleging that she had become disabled as of October 9, 2006 due to back and neck injuries she had sustained in an automobile accident.  (Transcript (hereafter "Tr.")[1] 37, 125-130, 144, 168.)  Plaintiff's application was denied on November 27, 2009.  (Tr. 56-71.) Subsequently, on January 20, 2010, plaintiff timely filed a written request for a hearing before an administrative law judge ("ALJ").  (Tr. 72-73.)  This request was granted and on November 2, 2010, plaintiff and her attorney appeared for a hearing before ALJ Seymour Rayner.  (Tr. 33.) On February 17, 2011, the ALJ rendered a written decision finding that plaintiff was not disabled within the meaning of the Social Security Act (the "SSA").  (Tr. 18-28.)

Plaintiff then requested review of the ALJ's decision by the Appeals Council ("AC"). (Tr. 17.)  On June 18, 2011, the AC issued a "partially favorable decision,"which affirmed the ALJ's decision that plaintiff was not disabled for the period between October 9, 2006 and February 16, 2011, but concluded that plaintiff had become disabled as of February 17, 2011 based on a change in her age category.  (Tr. 7-14.)  On July 29, 2011, however, the AC notified plaintiff that it intended to review its June 18, 2011 decision pursuant to 20 C.F.R. § 404.969 "because there [was] a clear error of law."  (Tr. 4.)  On September 1, 2011, the AC issued a written decision finding that plaintiff's disability insurance benefits insured status expired on

---

[1]    References to "Tr." are to the Administrative Record filed in this case.

December 31, 2010 and, thus, she did not qualify for disability insurance benefits for the period of disability beginning February 17, 2011. (Tr. 5.) The decisions of the AC, which incorporate the ALJ's findings for the period before February 17, 2011, constitute the final decisions of the Commissioner. (Tr. 4.)

## II.    *Factual Background*

### A.    *Non-Medical Evidence*

#### 1.    <u>General Information</u>

Plaintiff was born on April 10, 1966. (Tr. 40.) She was forty years of age as of October 9, 2006, the date of the onset of her alleged disability, and was two months shy of age forty-five on the date of the ALJ's decision. She was born in the Dominican Republic and moved to the United States in 1994. (Tr. 40.) Plaintiff speaks "a little bit" of English and testified through an interpreter at the hearing before the ALJ. (Tr. 33, 36.) Plaintiff cannot write in English. (Tr. 36.) Plaintiff attended school in the Dominican Republic through the third grade and received no education in the United States. (Tr. 40.) Plaintiff's daughter completed the papers submitted as part of her application for SSI benefits. (Tr. 36.)

Between 1994 and 2006, plaintiff worked full-time performing cooking, cleaning, and maintenance duties in hotels and restaurants. (Tr. 158-65.) This work required her to walk and stand for six hours in an eight hour work day, and alternate between stooping, kneeling, crouching, and crawling for three hours of an eight hour work day. (Tr. 169.) The heaviest item plaintiff was required to lift performing this work was twenty pounds, and she was routinely required to lift fifteen pounds. (Tr. 169.) Plaintiff ceased working in March or April 2006, approximately seven months before the onset of her alleged disability, because she moved to a

different town.  (Tr. 37, 168.)

On October 9, 2006, plaintiff was involved in a car accident.  (Tr. 37-38.)  She was taken by ambulance to the Southampton Hospital and released the same day.  (Tr. 38.)  As a result of the car accident, plaintiff sustained injuries to her neck and back.  (Tr. 38-39.)

###     2.     Function Report

On September 22, 2009, plaintiff completed a Function Report that was submitted to the New York State Office of Temporary and Disability Assistance, Division of Disability Determination.  (Tr. 147-65.)  In the Function Report, plaintiff stated that she lived in a house with family and spent her days cooking, sitting on the patio, and caring for her grandchildren. (Tr. 147-48.)  She stated that she generally did not need help caring for her personal needs but did, however, require help to put on her shoes and socks.  (Tr. 148-49.)  Plaintiff spent about one hour per day cooking, and also performed some laundry and cleaning activities, but needed help with lifting.  (Tr. 149-50.)  Plaintiff had a driver's license, could drive, and could go out alone. (Tr. 150.)  She reported that she went grocery shopping every week for about a half-hour, and could pay bills, handle a savings account, count change, and use a checkbook.  (Tr. 151.) Plaintiff stated that her impairments affected her ability to sit for long periods of time, kneel, lift, see clearly, and reach her right foot.  (Tr. 152.)  She reported that she used a cane and wore glasses.  (Tr. 153.)  She stated that she could walk for approximately fifteen minutes before she needed to rest for five minutes.  (Tr. 153.)  She complained of severe neck and back pain that radiated to her right leg.  (Tr. 155.)  Plaintiff took fifty milligrams of Tramadol HCL twice per day and took ten milligrams of Cyclobenzaprine twice daily.  (Tr. 156.)  This medication relieved her pain for approximately two or three hours.  (Tr. 156.)  Plaintiff also wore a corset for back

support.  (Tr. 157.)

### 3. Hearing Testimony

During the hearing, plaintiff testified that she lived with her two adult children.  (Tr. 40-41.)  She testified that she slept in a room located at the top of a four-step stairway, and that she felt pain in her spine when she went up and down the stairs.  (Tr. 41.)  Plaintiff cooked occasionally and did not do any cleaning.  (Tr. 41.)  She testified that she could shower, comb her hair, put on a coat, fasten buttons and zippers, tie a bow, put on a blouse over her head, make her bed, wash dishes, open an envelope, hold a cup of coffee, open doors, open dresser drawers, take clothes out of the closet, squeeze toothpaste on a brush, write with a pen, and open a can.  (Tr. 46-49.)  Although plaintiff indicated in the Function Report that she did laundry, plaintiff testified that she was not able to do so.  (Compare Tr. 47 with Tr. 150.)  Further, despite stating in the Function Report that she could handle a savings account and was able to pay bills, plaintiff testified that she did not have a bank account and did not pay any bills.  (Compare Tr. 48 with Tr. 151.)  Plaintiff testified that she visited the Dominican Republic for approximately fifteen to twenty days in 2010.  (Tr. 49.)  Plaintiff testified that she could walk approximately a distance of one-half of a block, and sit for between fifteen and thirty minutes at a time.  (Tr. 43-44, 50.)  Plaintiff testified that she took pain medication every day, and also took medication to help her sleep.  (Tr. 44, 46.)

### B. *Medical Evidence*

### 1. Dr. Jorge Reiley – Neurologist

Dr. Reiley examined plaintiff on October 25, 2006, following her involvement in the

5

October 9, 2006 automobile accident. (Tr. 304.) Plaintiff complained of neck pain that radiated intermittently and sharply into her left shoulder and was sometimes associated with numbness, tingling, and weakness in her left hand. (Tr. 304.) She reported moderately severe low back pain, which sometimes radiated intermittently and sharply into the right lower extremity and was sometimes associated with numbness and tingling. (Tr. 304.) Although plaintiff reported receiving chiropractic treatments that provided some relief for her symptoms, those symptoms had remained persistent since the time of the accident. (Tr. 304.)

A mental status examination revealed no abnormalities. (Tr. 304-05.) Examination of the cranial nerves, sensory nerves, and coordination showed no abnormalities. (Tr. 305.) Plaintiff had mild weakness with shoulder abduction (left greater than right), mild weakness of the intrinsic muscles of her left hand, and mild weakness of the right hip flexion. (Tr. 305.) She had some tenderness in the left shoulder upon being administered a compression test. (Tr. 305.) The rest of her muscle strength was intact throughout, with normal volume and tone, and no involuntary movements. (Tr. 305.) Dr. Reiley's examination of plaintiff's deep tendon reflexes showed "[m]inimally hypoactive ankle jerks" but no other abnormalities. (Tr. 305.) Plaintiff had normal posture and an antalgic gait, and she could walk on her heels and toes without difficulty. (Tr. 305.) She had some difficulty performing deep knee bends. (Tr. 305.) Further examination revealed cervical and lumbosacral paraspinal muscle tenderness, and restriction of cervical and lumbar mobility in all directions. (Tr. 305.) Straight leg raising was equivocal on the right at forty degrees. (Tr. 305.)

Dr. Reiley diagnosed plaintiff as having: (1) closed head trauma with residual post-traumatic left-sided headaches and post-concussion syndrome, (2) cervical spine

derangement/sprain/strain, (3) lumbosacral spine derangement/sprain/strain, and (4) internal derangement of the left shoulder. (Tr. 305.) Dr. Reiley referred plaintiff for a magnetic resonance imaging ("MRI") to assess for post-traumatic herniated discs in the spine. (Tr. 305.) Dr. Reiley instructed plaintiff to do in-home stretching exercises, to continue with chiropractic adjustments, and to avoid heavy lifting, repetitive bending, and twisting. (Tr. 305.) He prescribed Tramadol to be taken as needed for pain, and noted that a trial of acupuncture would be considered. (Tr. 305-06.)

On November 2, 2006, plaintiff underwent lumbar and cervical spine MRIs. (Tr. 195-99.) The MRI of her lumbar spine revealed findings consistent with a small disc herniation at L5-S1 with narrowing of the disc space and water loss phenomenon, but no deviation of either S1 nerve root; a small disc herniation or prominent disc bulge at L4-L5 with minimum water loss phenomenon; and a fibroid uterus. (Tr. 196.) The cervical spine MRI revealed a slight reversal of the normal cervical lordosis centered at the C4-C5 level. (Tr. 197-98.) This MRI further revealed a normal-appearing cervical cord, and a nonspecific volume loss within the brain that was prominent for the plaintiff's age of forty years. (Tr. 197-98.) Lastly, this MRI showed findings consistent with disc herniation at C4-C5 and small disc herniations at C5-C6 and C6-C7. (Tr. 197-99.)

### 2. Dr. Alexandre de Moura – Orthopedic Surgeon

On November 17, 2006, plaintiff visited Dr. de Moura. (Tr. 302-03.) During the physical examination, plaintiff appeared to be "in excessive discomfort." (Tr. 303.) Dr. de Moura noted evidence of bilateral paraspinal muscular spasm of the cervical and lumbar spine, and that cervical and lumbar range of motion as well as left and right bending were severely limited. (Tr.

303.) Motor strength and sensation of the upper and lower regions were intact. (Tr. 303.) The doctor noted that MRI reports revealed evidence of disc herniation at C5-C6 and C6-C7, along with internal derangements at the L5-S1 disc space. (Tr. 303.) Dr. de Moura concluded that plaintiff had cervical herniated discs, along with damage at the L5-S1 level. (Tr. 303.) He recommended that plaintiff enroll in physical therapy, and prescribed anti-inflammatory medication and muscle relaxants. (Tr. 303.) He noted that if plaintiff's symptoms became incapacitating, he would contemplate surgical intervention. (Tr. 303.)

### 3. Brian Barrett, D.C., D.A.C.N.B. – Chiropractic Neurologist

On December 6, 2006, Dr. Barrett performed electromyography ("EMG") testing and a nerve conduction study on plaintiff. (Tr. 339-42, 350-59.) Dr. Barrett felt that this testing was necessary due to plaintiff's severe radicular symptoms following her automobile accident. (Tr. 350.) The tests revealed evidence of moderate subacute radiculopathy at C5 and C6 on the left side. (Tr. 340.)

### 4. Lumbar Spine Surgery Performed by Dr. de Moura

On March 7, 2007, plaintiff underwent lumbar spine surgery at the New York University Hospital for Joint Disease. (Tr. 202-96, 299-301.) Dr. de Moura performed a total disc replacement at L5-S1, and an anterior diskectomy and interbody fusion at L4-L5. (Tr. 202.) Dr. de Moura conducted a post-operative examination of plaintiff on March 15, 2007, and reported that her symptoms had improved since the operation. (Tr. 298.) At a March 30, 2007 follow-up visit with Dr. de Moura, plaintiff again reported that her symptoms had improved since the last office visit. (Tr. 297.) Dr. de Moura described the plaintiff's lumbar symptoms as "Benign. Not of concern to patient. Can live with this problem." (Tr. 297.)

5. **Dr. Erlinda Austria – Surgeon**

On October 28, 2009, plaintiff was referred by the Division of Disability Determination to Dr. Austria for a consultative orthopedic examination. (Tr. 320-23.) Plaintiff complained of pain in her lower back, neck, and left shoulder. (Tr. 320.) She reported that she was not undergoing physical therapy, but took pain medication. (Tr. 320.) Plaintiff described her pain as having a severity level of five or six out of ten on a good day. (Tr. 320.) She reported that she could sit for twenty-minute periods, stand for twenty-minute periods, walk for fifteen-minute periods, and lift five pounds at a time. (Tr. 320.) Plaintiff reported that her daughter did most of the household cooking, cleaning, laundry, and shopping. (Tr. 321.) She stated that she could shower and dress herself, but had difficulty putting on her socks and tying her shoes. (Tr. 321.) According to plaintiff, she spent her days watching television and listening to the radio. (Tr. 321.)

Dr. Austria observed that plaintiff did not appear to be in acute distress, but seemed anxious. (Tr. 321.) The doctor noted that plaintiff walked with a limp favoring the right leg. (Tr. 321.) She could walk, with some difficulty, on her heels and toes and could squat halfway. (Tr. 321.) Plaintiff used a cane for walking long distances, but Dr. Austria opined that because there was no difference in plaintiff's gait with or without the cane, it was not medically necessary. (Tr. 321.) Plaintiff was able to change for the examination, maneuver on and off the examination table, and rise from a chair without difficulty. (Tr. 321.)

Upon physical examination, plaintiff had full strength and range of motion in her shoulders, elbows, wrists, forearms, and fingers. (Tr. 321.) Dr. Austria did not observe any inflammation, effusion or instability, or muscle atrophy or sensory abnormality, and plaintiff's

reflexes were "physiologic and equal." (Tr. 321-22.) Plaintiff had a full range of motion in the cervical spine, with no cervical or paracervical pain or spasm, and no trigger points. (Tr. 321.) Her thoracic and lumbar spine showed flexion and extension to sixty degrees, lateral flexion to twenty-five degrees bilaterally, and rotary movements to twenty-five degrees bilaterally. (Tr. 322.) There was no sciatic notch tenderness, no spasm, no scoliosis or kyphosis, and no trigger points. (Tr. 322.) Straight leg raising in the supine position was performed to forty-five degrees on the right, and ninety degrees on the left; in the sitting position, it was performed to sixty degrees on the right and ninety degrees on the left. (Tr. 322.) Hip and knee ranges of motion were limited on the right side. (Tr. 322.) Plaintiff's lower extremities had full strength bilaterally, no muscle atrophy or sensory abnormality, and no "joint effusion" inflammation, or instability. (Tr. 322.) Her reflexes were normal. (Tr. 322.)

Dr. Austria diagnosed plaintiff with neck, back, and right leg injuries secondary to trauma with herniated cervical disc and herniated lumbar disc by history, as well as persistent pain in the lower back radiating to the right leg. (Tr. 322.) She assessed that plaintiff's prognosis was stable to poor, and noted that plaintiff would need further evaluation and treatment for her lower back. (Tr. 322.) Dr. Austria opined that plaintiff had moderate restriction with limited range of motion for activities involving the right leg, and mild restriction for squatting, bending, prolonged sitting, standing, and walking. (Tr. 322-23.) Dr. Austria opined that plaintiff had no restriction for activities of the head, neck, and upper extremities, including fine motor movements. (Tr. 323.)

### 6.  Physical Residual Functional Capacity Assessment

On November 25, 2009, P. Payne, an analyst with the New York State Division of

Disability Determinations, completed a Physical Residual Functional Capacity Assessment based on plaintiff's medical records and related evidence.  (Tr. 325-30.)  Payne determined that plaintiff could frequently lift or carry ten pounds, stand or walk for at least two hours in an eight hour work day, and sit with normal breaks for six hours in an eight hour work day.  (Tr. 325-30.)

       **7.**    **Dr. Reiley's Medical Assessment of Plaintiff's Ability to do Work-Related Activities**

On September 1, 2010, Dr. Reiley completed a Medical Assessment of Ability to Do Work-Related Activities.  (Tr. 336-38.)  He opined that plaintiff was limited to lifting ten pounds frequently due to spasms and restricted mobility in her neck and lower back, as well as weakness in her arms and legs.  (Tr. 336.)  He assessed that plaintiff could sit or stand and/or walk for a maximum of two hours total, respectively, in an eight-hour workday due to severe neck and lower back pain.  (Tr. 336-37.)  Plaintiff could never climb, stoop, crouch, kneel, or crawl, and could balance only occasionally due to leg weakness, decreased leg sensation, and exacerbation of neck and lower back pain.  (Tr. 337.)  He opined that plaintiff also had weakness and decreased sensation in her arms and legs, which affected her ability to feel, push, and pull.  (Tr. 338.)  Lastly, Dr. Reiley noted that plaintiff should avoid exposure to moving machinery, temperature extremes, and humidity.  (Tr. 338.)

Dr. Reiley also wrote an undated letter addressed "To whom it may concern," which listed the dates of plaintiff's office visits with him during 2010.  (Tr. 348-49.)  In that letter, Dr. Reiley gave a final impression of cervical, thoracic, and lumbosacral spine derangement status following the lumbar laminectomy and fusion surgery, with residual lumbar radiculopathy, and persistent cervical radiculopathy.  (Tr. 348.)  The doctor stated that plaintiff had been disabled

since the time of her injury in October of 2006, had been prescribed pain medications and muscle relaxants to take as needed, and had been given cervical and lumbosacral nerve blocks to minimize her pain.  (Tr. 349.)

## *DISCUSSION*

### I.      *Legal Standards*

#### A.      *Review of the ALJ's Decision*

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'"  *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  Thus, the only issue before the Court is whether the ALJ's finding that plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence."  *Rosa*, 168 F.3d at 77.

#### B.      *Eligibility for Disability Benefits*

To be eligible for disability benefits under the SSA, a claimant must establish that he or

she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (alterations in the original) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curium)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of

working.  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### C.     *The Treating Physician Rule*

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2) (2011)[2]; *see also Rosa*, 168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts."  *Halloran*, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2) (2011)).  These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)(i-ii) & (d)(3-6) (2011); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so.  20 C.F.R. §

---

[2]     On March 26, 2012, 20 C.F.R. § 404.1527 was amended such that the language in subsection (d)(2), which is cited in the text above, was moved to subsection (c)(2).  The substance of the text has not changed.  Because, however, plaintiff's action was filed on September 21, 2011, the Court will cite to the version of the regulations that was in effect at that time.

404.1527(d)(2) (2011).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964, 968-69 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barnhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.") (internal quotation marks and alteration omitted), *amended on other grounds on rehearing*, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is

disabled." 20 C.F.R. §§ 404.1512(e), (e)(1) (2011).[3]  The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." *Id.* § 404.1512(e)(1) (2011).  The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." *Id.* § 404.1512(e)(2) (2011).  If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id.* § 404.1512(f).

## II.     *The ALJ's Decision*

As an initial matter, the ALJ found that plaintiff met the status requirements of sections 216(i) and 223 of the SSA, but only to the extent that she had acquired sufficient quarters of coverage to remain insured through December 31, 2010.  (Tr. 21, 23.)  Thus, the ALJ concluded, plaintiff was required to establish a disability on or before that date in order to be entitled to a period of disability benefits.  (Tr. 21.)

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that plaintiff satisfied the first two steps, to wit: (1) plaintiff had not engaged in substantial gainful activity since October 9, 2006; and (2) plaintiff's neck and low back pain secondary to degenerative disc disease constituted severe impairments.  (Tr. 23.)  The ALJ concluded that plaintiff did not meet the third step, however, because her impairments did not meet or equal in

---

[3]         This regulation was substantially amended on March 26, 2012.  As noted in the prior footnote, however, since plaintiff commenced this action on September 21, 2011, the Court will apply the pre-amendment version of the regulation.

severity any impairment in the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations. (Tr. 23-24.) At the fourth stage of the analysis, the ALJ determined that plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), because "in an 8-hour workday, [plaintiff] can sit up to 6 hours, stand/walk up to 2 hours and lift/carry up to 10 pounds occasionally with occasional bending and stooping possible." (Tr. 24.) The ALJ based this conclusion "upon the impression of Dr. Erlinda Austria . . . as supplemented by a Physical Residual Functional Capacity Assessment by a State Agency medical consultant for sedentary work [ ] and the claimant's own testimony regarding a broad range of activities of daily living." (Tr. 24.) The ALJ did not afford controlling weight to the opinion of Dr. Reiley, plaintiff's treating physician. (Tr. 26.)

Next, the ALJ concluded that plaintiff was unable to perform her "past, relevant, medium to heavy, work as a kitchen helper in a restaurant." (Tr. 27.) The ALJ then analyzed the fifth and final step, viz. whether the Commissioner had established that there was other work plaintiff could have performed. In this regard, the ALJ concluded that despite plaintiff's impairments, she could perform work in other jobs that existed in significant numbers in the national economy. (Tr. 27.) Thus, the ALJ found plaintiff was not disabled under the SSA.

As set forth in the "Procedural Background" section above, the AC initially determined that the ALJ's conclusion at the fifth step of the analysis was erroneous to the limited extent that plaintiff became disabled as of February 17, 2011 based on a change in her age category. (Tr. 12-13.) Upon further review, however, the AC determined that plaintiff's eligibility for disability insurance benefits expired as of December 31, 2010. (Tr. 5.)

### III.    The Parties' Arguments

Plaintiff argues that the ALJ's decision was erroneous for three reasons.  First, plaintiff asserts that the ALJ violated the treating physician rule by not affording controlling weight to Dr. Reiley's assessment of plaintiff's condition and by failing to articulate why he gave controlling weight to the opinions of Dr. Austria.  Second, plaintiff argues that the ALJ erroneously failed to request that a Vocational Expert ("VE") either be present at the hearing or respond to interrogatories to provide information regarding the types of jobs that plaintiff could perform in the national or local economy.  Finally, plaintiff contends that "the ALJ erred in not finding that [plaintiff] has an inability to communicate in English," and "did not take into account the plaintiff's education, in combination with her functional limitations, in deciding that there was a full range of sedentary jobs that she could perform."  (Pl.'s Mem. at 19.)

The Commissioner asserts that the ALJ did not err by declining to afford Dr. Reiley's opinion controlling weight because "the record demonstrates a significant time gap in plaintiff's treatment" with Dr. Reiley, and because his opinion "was not well-supported and was inconsistent with substantial evidence of record – the findings of Dr. Austria and of plaintiff's surgeon, Dr. de Moura."  (Def.'s Mem. at 15 & 17.)  The Commissioner further contends that "[t]he ALJ did not consult a [VE] because a [VE] is only required where a claimant's work capacity is significantly diminished by nonexertional limitations," and here, the ALJ "properly found that plaintiff did not have any nonexertional limitations" and that she could perform the full range of sedentary work.  (Def.'s Reply at 5.)  Finally, the Commissioner argues that even if the ALJ erroneously concluded that plaintiff could communicate in English, such an error was harmless because he also concluded that she was illiterate, and applied the same Medical-

Vocational Rule as would have been applied had he found that plaintiff was unable to communicate in English. (*Id.* at 5-6.)

## IV.    *Application of the Governing Law to the Present Facts*

### A.    *The ALJ did not Violate the Treating Physician Rule*

Plaintiff asserts that the "ALJ's reasoning behind accepting the functional limitations as prescribed by Dr. Austria over the functional limitations as assessed by Dr. Reilly (sic) is grossly inadequate" and, more specifically, "the ALJ simply decided to give controlling weight to Dr. Austria without any reasonable explanation as to why." (Pl.'s Mem. at 16.) To the contrary, however, the ALJ considered Dr. Reiley's September 1, 2010 report, which set forth, *inter alia*, his opinion that plaintiff could not sit for more than two hours in an eight-hour workday. (Tr. 26.) The ALJ noted, however, that this report was based on an MRI study conducted in November 2006 and "there [was] no indication that any new MRI or EMG studies have been performed since 2006/2007 or since the claimant began seeing Dr. Reiley again in January 2010 after a long hiatus since seeing him in consultation back in October 2006." (Tr. 26.)

During that interim period, however, plaintiff had undergone lumbar spinal surgery. Dr. de Moura reported that plaintiff's condition had improved following the surgery and that, as of March 30, 2007, plaintiff's symptoms were "[b]enign," "[n]ot of concern to patient," and that plaintiff "[c]an live with this problem." (Tr. 297.) In October 2009, after Dr. Austria examined plaintiff, she opined that plaintiff had, *inter alia*, mild restrictions for prolonged sitting, standing, and walking, and no restriction for activities of the head, neck, and upper extremities, including fine motor movements. (Tr. 322-23.)

Thus, Dr. Reiley's assessment that plaintiff suffered severe neck and lower back pain that

restricted her to sitting for only two hours in an eight-hour work day conflicted with the opinions of Dr. de Moura and Dr. Austria. The ALJ also found that Dr. Reiley's assessment that plaintiff was precluded from bending, stooping, or pushing and pulling conflicted with plaintiff's own testimony, as well as the information she provided in the Function Report, regarding her restrictions and abilities. (Tr. 26 (noting plaintiff's testimony that she was able to take a 15-day vacation, bend to make her bed, push and pull to open doors and drawers, reach to take clothes from the closet, cook, and do dishes, and noting plaintiff's indication in the Function Report that she cooks and cares for her grandchildren daily, does laundry, cleaning, and cooking, can drive a car, and can shop on a weekly basis for thirty minutes at a time).) Therefore, the ALJ did not err in declining to assign controlling weight to Dr. Reiley's medical opinion. *See Roma v. Astrue*, 468 Fed. Appx. 16, 18-19 (2d Cir. Jan. 19, 2012) (concluding that the ALJ "properly declined to accord controlling weight to the opinion" of the treating physician when his "assessment was inconsistent in material respects with other substantial evidence," including other physicians' opinions and the claimant's own testimony); *Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.") (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).[4]

---

[4]     Plaintiff contends that the ALJ erred by failing to mention Dr. Reiley's undated letter, addressed "To whom it may concern," which outlined the dates of plaintiff's office visits between January and October 2010, and which set forth his impression that "Plaintiff has been disabled since the time of her injury . . . ." (Tr. 349.) As the Second Circuit has made clear, "some kinds of findings – including the ultimate finding of whether a claimant is disabled and cannot work – are reserved to the Commissioner," and so "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Plaintiff asserts, and defendant agrees, that the ALJ erred in giving "some weight" (Tr. 25) to the assessment of State Agency consultant P. Payne (which was based solely upon Dr. Austria's examination findings and which concluded that plaintiff could sit with normal breaks for six hours in an eight hour work day) because Payne is not a medical professional.[5]  (Pl.'s Mem. at 14; Def.'s Reply at 4; *see also* Tr. 325-30.)  "The opinions of a disability analyst regarding a claimant's [residual functional capacity] are not entitled to any medical weight," but may be used "as an 'other source' evaluation in addition to evidence from the acceptable medical sources . . . to show the severity of a claimant's impairment(s)."  *Buschle v. Astrue*, 2012 WL 463443, at *3 (N.D.N.Y. Feb. 13, 2012) (internal quotation marks, citations, and alterations omitted).  "Where an ALJ errs by improperly relying on such an opinion, yet other competent medical evidence regarding the claimant's [residual functional capacity] is present in the record, the error does not require remand."  *Id.*; *see also Davies v. Astrue*, 2010 WL 2777063, at *7 (N.D.N.Y. June 17, 2010) (finding ALJ's determination as to claimant's residual functional capacity was "based on substantial evidence" when ALJ relied not just on opinion of disability analyst but on medical opinion as well); *Napierala v. Astrue*, 2009 WL 4892319, at *6 (W.D.N.Y. Dec. 11, 2009) (finding that although "the ALJ improperly assigned significant weight to the disability analyst's non-medical opinion, substantial medical evidence exists in the

_____

[5]        In his opinion, the ALJ cited Social Security Ruling 96-6p, which sets forth that findings of fact made by State Agency medical consultants "regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the [ALJ] and [AC] levels of administrative review," and an ALJ "may not ignore these opinions and must explain the weight given to these opinions in their decisions."  SSR 96-6p, 1996 WL 374180, at *1 (S.S.A. July 2, 1996).  Pursuant to this Social Security Ruling, the ALJ afforded P. Payne's assessment "some weight."  (Tr. 25.)  The parties agree, however, that the ALJ erred in concluded that Payne was a "medical consultant" as that term is used in this Social Security Ruling.  (Pl.'s Mem. at 14; Def.'s Reply at 4.)

record supporting the ALJ's determination of plaintiff's RFC").  Here, any error committed by

the ALJ by affording Payne's assessment "some weight" does not require remand, because the

ALJ's determination as to plaintiff's residual functional capacity is also supported by Dr. de

Mora and Dr. Austria's opinions.

###### B. The ALJ did not Commit Error by Failing to Consult a Vocational Expert

Plaintiff asserts that the ALJ erred by failing "to request that a [VE] be present at the

hearing," and by failing to "send interrogatories to a VE to inquire as to what types of jobs the

plaintiff could perform in the national or local economy."  (Pl.'s Mem. at 18.)  Generally, the

Commissioner can meet "the burden of proving that the claimant still retains a residual functional

capacity to perform alternative substantial gainful work which exists in the national economy"

solely "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404,

Subpt. P, App. 2 (1986)."  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  By contrast, "in a

case where both exertional and nonexertional limitations are present, the guidelines cannot prove

the exclusive framework for making a disability determination," and the production of a VE may

become necessary.  *See id.*

Exertional limitations are those that related to a claimant's "ability to meet the strength

demands of jobs," i.e., "sitting, standing, walking, lifting, carrying, pushing, and pulling."  20

C.F.R. § 404.1569a(b).  Nonexertional limitations are imposed by a claimant's impairments that

affect her ability to meet the requirements of jobs other than strength demands, and include

anxiety and depression.  20 C.F.R. § 404.1569a(c).  Here, it is undisputed that plaintiff has not

claimed any nonexertional limitations, and the ALJ concluded that she could "perform the full

range of sedentary work."  (Tr. 24.)  As such, the ALJ did not err by using the Medical

Vocational Guidelines as its sole framework for determining whether plaintiff was "disabled" or "not disabled." (Tr. 27 (citing SSR 83-11, 1983 WL 31252, at *1 (1983).) *See Wiebicke v. Astrue*, 2012 WL 2861681, at *19 (S.D.N.Y. July 2, 2012) ("Because Wiebicke could perform a full range of light work and alleged only exertional limitations, it was proper for ALJ Ross to rely solely on the Grids in determining Wiebicke's disability status.").

### C. *Any Error in the ALJ's Conclusion That Plaintiff was Able to Communicate in English was Harmless*

Plaintiff asserts that "the ALJ erred in not finding that Ms. Jimenez has an inability to communicate in English." (Pl.'s Mem. at 18.) The Commissioner contends that "even if this were error, it was harmless because the ALJ concluded that plaintiff was illiterate, and thus applied Medical-Vocational Rule 201.23," 20 C.F.R. Part 404, Subpart P, App. 2. (Def.'s Reply at 5 (citing Tr. 27-28).) Rule 201.23 states that when a claimant has a residual functional capacity for the full range of sedentary work, and is between ages 18 and 44, is illiterate *or* unable to communicate in English, and has either nonexistent or unskilled past work experience, that claimant should be found not disabled. Here, although the ALJ concluded that plaintiff had the ability to communicate in English, he also found that she was illiterate and, as such, applied Rule 201.23. (Tr. 28.) Even if the ALJ had concluded that plaintiff was unable to communicate in English, he still would have applied Rule 201.23 and, therefore, his conclusion that plaintiff was "not disabled" would not have changed. Accordingly, even assuming *arguendo* that the ALJ erred in finding that plaintiff had the ability to communicate in English, such error was harmless.

*CONCLUSION*

For the reasons set forth above, plaintiff's motion is denied, defendant's motion is granted, and the decision of the Commissioner is affirmed.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated:  Central Islip, New York
          March 31, 2013

                                                          _____/s/_____
                                                          Denis R. Hurley
                                                          Unites States District Judge